**This order is SIGNED.**

**Dated: December 4, 2018**





**WILLIAM T. THURMAN**
**U.S. Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | |
| BLACK IRON, LLC, | Bankruptcy No. 17-24816 |
| Debtor | Chapter 11 |
| WELLS FARGO RAIL CORPORATION f/k/a FIRST UNION RAIL CORPORATION and HELM PACIFIC LEASING, | |
| Plaintiff, | Adversary Proceeding Number: 17-2088 |
| vs. | (Consolidated with Adv. Pro. No. 17-2094) |
| BLACK IRON, LLC; CML METALS CORPORATION; P.I.C. RAILROAD, INC. d/b/a CML RAILROAD, INC.; and GILBERT DEVELOPMENT CORPORATION, | Honorable William T. Thurman |
| Defendant. | |

### MEMORANDUM DECISION ON DEFENDANTS/THIRD-PARTY PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON BLACK IRON, LLC'S CLAIMS AND MEMORANDUM IN SUPPORT (DKT. NO. 67)

## I. Introduction

The matter before the Court is the Defendants/Third-Party Plaintiffs' Motion for

Summary Judgment on Black Iron, LLC's Claims and Memorandum in Support (the "Motion")

filed on October 15, 2018 at Dkt. No. 67. The Defendants and Third-Party Plaintiffs in this

action will be collectively referred to as "Wells Fargo Rail" and the Defendants will be

collectively referred to as "Black Iron." Wells Fargo Rail seeks summary judgment in its favor

dismissing all claims brought against it by Black Iron for storage fees and trespass. Black Iron

filed an objection to the Motion on November 12, 2018 at Dkt. No. 71. Wells Fargo Rail filed a

reply on November 21, 2018 at Dkt. No. 74.

At the hearing on the Motion held on Nov. 29, 2018, Troy Aramburu and Bret Evans

appeared on behalf of Wells Fargo Rail. Dana Farmer and Blake Hamilton appeared on behalf of

Black Iron. The Court heard oral argument, read the briefs filed by the parties, conducted its own

independent review of the law and makes the following findings of fact and conclusions of law

pursuant to Federal Rule of Bankruptcy Procedure 7052.

## II. Jurisdiction, Venue and Notice

The jurisdiction of this Court is properly invoked under 28 U.S.C. § 1334, and has been

expressly consented to by the parties. This is a core proceeding within the meaning of  28 U.S.C.

§ 157(b)(2), and this Court may enter a final order. Venue is proper under the provisions of 28

U.S.C. §§ 1408 and 1409. Notice of the hearing is found to be proper in all respects.

## III. Standard for Summary Judgment

Under Federal Rule of Civil Procedure 56(a), which is made applicable to adversary

proceedings by Federal Rule of Bankruptcy Procedure 7056, the Court shall grant a motion for

summary judgment "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Substantive law determines which facts are material and which are not. "Only disputes

over facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). Whether a dispute is genuine turns on whether the evidence is such that a reasonable fact

finder could return a verdict for the nonmoving party. The court does not weigh evidence or

make credibility determinations at this point, *see id*. at 249, but is to decide whether there is a

genuine issue for trial.

The moving party bears the burden to show that it is entitled to summary judgment. *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden includes properly supporting its

summary judgment motion as required by Rule 56(c). *See Murray v. City of Tahlequah, Okla*.,

312 F.3d 1196, 1200 (10th Cir. 2002). Once the moving party meets this burden, "the burden

shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."

*Concrete Works of Colorado, Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir.

1994) (citations omitted).

It is under these parameters that the Court issues this decision.

**IV. Factual Background**

This dispute arose out of a lease transaction involving railcars and locomotives used in a

mining venture near Cedar City, Utah. In general, the Court is called upon to make a

determination of whether Wells Fargo Rail should be assessed storage fees for the railcars and

locomotives that are on railroad tracks situated on Black Iron's land. Beginning in June 2010,

Helm Financial Corporation, Wells Fargo Rail's predecessor-in-interest, and Helm-Pacific

Leasing, as lessors, entered into four leases and related guaranties (the "Leases") with CML

Metals Corporation ("CML Metals") and PIC Railroad, Inc. d/b/a CML Railroad, Inc. ("CML

Railroad"), for 540 railcars and four locomotives (the "Equipment"). During the next four years,

CML Metals used the Equipment in its mining operations and surrounding real property then-

3

owned by CML Metals (the "Property"). In October 2014, CML Metals suspended operations

and stopped paying Wells Fargo Rail the payments due under the Leases. By letter dated

November 20, 2014,[1] CML Metals asked Wells Fargo Rail to forbear from exercising available

remedies in order to allow CML Metals an opportunity to be sold as a going concern. The

Equipment remained on CML Metals' Property while CML Metals and Wells Fargo Rail began

negotiating a forbearance agreement, and several drafts were exchanged up until March 2015.[2]

However, the forbearance agreement was never signed. It is noted that Wells Fargo Rail is not an

operating railroad, but rather a vehicle for financing railcars only.

On April 2, 2015, CML Metals, through its chairman Michael Conboy, entered into an

Asset Purchase Agreement ("APA") with Steve Gilbert, President of Gilbert Development

Corporation ("GDC") to transfer substantially all of CML Metal's assets to GDC. On April 29,

2015, GDC assigned its rights to receive CML Metal's assets under the APA to Black Iron. GDC

remained obligated for several assumed liabilities that were listed in the APA. This asset

purchase transaction closed on or about May 5, 2015. Since that date, Black Iron has owned the

Property upon which the Equipment is located. While the land was now owned by Black Iron,

some of the railroad tracks were owned by Union Pacific Railroad Company or by CML

Railroad.

Wells Fargo Rail did not know about the asset sale until after it had closed. On May 8,

2015, Steve Gilbert called Robert Bowers, an attorney representing First Union Rail Corporation

---

[1] *See* Letter from Chris Bradley, VP of Finance at CML Metals Corporation to First Union Rail, Dkt. No. 68, Exh.
B. The letter states that as of Oct. 16, 2014, CML has shut down its mining operations. CML acknowledged its lease
obligation, but stated that it was negotiating financial terms with potential purchasers, and asked that First Union
Rail not bring a legal claim at this time. First Union Rail proposed a deferred payment schedule while it worked to
complete an asset sale, and suggested that a buyer would "invest in the project and again utilize First Union's
services."
[2] *See* Letter from Robert Bowers, Dkt. No. 68, Exh.T. Mr. Bowers, attorney for First Union Rail Corporation, stated
that First Union would file a complaint against CML Metals if the attached forbearance agreement was not signed.

(a predecessor of Wells Fargo Rail, which will be referred to simply as Wells Fargo Rail for ease

of reference), and told Mr. Bowers that the railcars and locomotives would need to be removed

or Black Iron would impose storage costs.[3] According to Steve Gilbert's recollection, Mr.

Bowers said that Wells Fargo Rail would remove the railcars. The parties have submitted

numerous email messages beginning in May and continuing throughout the summer of 2015

evidencing Wells Fargo Rail's efforts to coordinate the repair teams, inspectors and other

personnel necessary to remove the 540 railcars and 4 locomotives from the Property which now

belonged to Black Iron. There were issues about the condition of the tracks and the railcars, and

the necessity for inspections and repairs. Wells Fargo Rail had communications about finding

locations to store the railcars once they were moved off Black Iron's property.[4]

In mid-August, Steve Gilbert discovered that Wells Fargo Rail intended to file a lawsuit

against Black Iron. On August 20, 2015, the individual at Black Iron who had been

communicating with Wells Fargo Rail about moving the railcars sent an email telling the Wells

Fargo Rail personnel to "cease and desist the plan to start interaction on the cars next week" due

to "legal issues pertaining to storage and security of the railcars."[5] While there is evidence that

Steve Gilbert told representatives of Wells Fargo Rail that he would charge it $100 per day per

railcar for storage, there is no evidence that Wells Fargo Rail ever agreed to pay this amount. In

fact, Wells Fargo Rail repeatedly stated it intended to move the railcars, not pay storage.[6]

After the "cease and desist" email, no one traveled to the Property to physically work on

the railcars to implement their removal although emails dated throughout the fall of 2015 sent by

---

[3] Deposition of Steve Gilbert, Dkt. No. 68, Exh. A at 226 et seq.
[4] *See* Dkt. No. 71, Exh 6, p.6.
[5] *See* email from Toni Cornforth at Black Iron to Andrew Sutherland at First Union Rail, Dkt. No. 68, Exh. L.
[6] *See* Deposition of Steve Gilbert, Dkt. No. 68, Exh. A at 226-57; Declaration of Robert T. Bowers, Dkt. No. 68, Exh. T.

and between individuals at Black Iron, Wells Fargo Rail, and Union Pacific (which owned some

of the railroad tracks) contain discussion about the preparations necessary to move the railcars.

This included inspecting the tracks, inspecting the railcars and locomotives, making necessary

repairs to the railcars and locomotives, and arranging for personnel to travel to the property to

conduct these activities. On March 15, 2016, an attorney for Black Iron sent a letter to an

attorney representing Wells Fargo Rail authorizing Wells Fargo Rail to enter the Property to

repair and extract the railcars and locomotives.[7] Storage costs for the railcars were demanded in

writing by letters dated April 4, 2016[8] and July 12, 2016.[9]

Wells Fargo Rail had hired a contractor in late spring 2016 to repair and move the

railcars, and while there are email communications discussing the work necessary to move the

railcars, no railcars were ever actually removed from Black Iron's Property because the repair

vendor hired by Wells Fargo Rail stated that repairs were necessary before the railcars could be

moved.[10] In July, 2016, a repair crew traveled from Missouri to Utah with the vehicles and

equipment to repair and extract the railcars.[11] However, on August 22, 2016, Black Iron sent a

letter stating that the Equipment may not be removed without payment to Black Iron in the

amount of $23,058,000 for storage costs.[12] Wells Fargo Rail has not paid that amount, and Black

Iron has not allowed Wells Fargo Rail to access the Property and remove the Equipment.

However, in June 2018, Wells Fargo Rail posted a bond in the amount of $10,000,000 so it could

---

[7] *See* Letter dated March 15, 2016 from Erik Olsen to Douglas Farr, Dkt. No. 68, Exh. M.
[8] *See* Letter dated April 4, 2016 from Erik Olsen to Douglas Farr, Dkt. No. 68, Exh. Q.
[9] *See* Letter dated July 12, 2016 from Dana Farmer to Douglas Farr, Dkt. No. 68, Exh. M.
[10] *See* Declaration of Andrew J. Sutherland, Dkt. No. 68, Exh I. Wells Fargo Rail stated that it spent about $480,000 on this extraction effort and this amount is undisputed.
[11] *See* Declaration of Douglas P. Farr in Support of Motion for Prejudgment Writ of Replevin and Substitution of Collateral, Dkt. No. 68, Exh. K.
[12] *See* Letter dated Aug. 22, 2016 from Dana Farmer representing Black Iron to Douglas Farr representing Wells Fargo Rail, Dkt. No. 68, Exh. M, pp. 5-21.

remove the Equipment.[13] Shortly thereafter, fire restrictions prevented activity, and so Wells

Fargo Rail did not have permission to enter Black Iron's Property until November 2018. The

current status of removal efforts is uncertain.

## V. Legal Discussion

Black Iron asserts that it is entitled to an award of storage fees against Wells Fargo Rail

on five grounds. They are: (1) breach of contract; (2) breach of contract implied in fact; (3)

unjust enrichment; (4) warehouse lien; and (5) trespass. The first four causes of action are based

on the argument that Wells Fargo Rail should pay Black Iron for storing the Equipment for at

least three years now, while the trespass cause of action is based on the argument that Wells

Fargo Rail has failed to remove the Equipment after the Property was transferred from CML

Metals to Black Iron. The Court will discuss each theory in turn.

### A. Breach of Contract Claim

To prevail on its breach of contract claim, Black Iron would need to prove the following

elements: "(1) a contract, (2) performance by the party seeking recovery [Black Iron], (3) breach

of the contract by the other party [Wells Fargo Rail], and (4) damages." *America West Bank*

*Members, L.C. v. State*, 342 P.3d 224, 230-31 (Utah 2014). "In order to properly state a claim for

a breach of contract, a party [Black Iron] must allege sufficient facts, which, when viewed as

true, satisfy each element." *Id.* (internal quotation marks and footnote omitted).

"Under the principles of basic contract law, 'a contract is not formed unless there is a

meeting of the minds.'" *Lebrecht v. Deep Blue Pools & Spas Inc.*, 374 P.3d 1064, 1069 (Ct. App.

Utah 2016) (quoting *Sackler v. Savin*, 897 P.2d 1217, 1220 (Utah 1995)). "Two elements, among

---

[13] *See* Order Granting in Part Motion for Prejudgment Writ of Replevin and Substitution of Collateral, Case No. 17-2094, Dkt. No. 251, entered on June 11, 2018.

others, are necessary to form an enforceable contract: (1) an offer and (2) an acceptance." *Id.*

(quoting *1-800 Contacts, Inc. v. Weigner*, 127 P.3d 1241 (Ct. App. Utah 2005)).

Steve Gilbert informed a representative of Wells Fargo Rail that the railcars and

locomotives had to be removed or Black Iron would impose storage fees.[14] Wells Fargo Rail's

representatives stated that the Equipment would be removed, and that it would not pay storage

fees. "An acceptance must unconditionally assent to all material terms presented in the offer,

including price and method of performance, or it is a rejection of the offer." *Lebrecht v. Deep*

*Blue Pools & Spas Inc.*, 374 P.3d 1064, 1069 (Ct. App. Utah 2016) (quoting *Cal Wadsworth*

*Constr. V. City of St. George*, 898 P.2d 1372, 1376 (Utah 1995)). The evidence submitted to the

Court in the form of emails, depositions and affidavits show that Wells Fargo Rail did not want

Black Iron to store the Equipment, but was taking steps to remove the Equipment from Black

Iron's property. While an ultimatum is not an offer in any event, to the extent that Black Iron

stated that Wells Fargo Rail should pay storage costs, Wells Fargo Rail rejected that proposition.

Black Iron initially gave Wells Fargo Rail permission to enter Black Iron's Property and

remove the Equipment, and then permission was withdrawn on Aug. 20, 2015.[15] Permission was

extended again in March 2016 but then in August 2016, that permission was made conditional

upon payment of about $23,058,000. These back and forth negotiations and/or conditional

statements do not demonstrate a "meeting of the minds" that would lead to contract formation.

The uncontroverted evidence submitted to the Court shows that the demanded rate of the

storage fees changed occasionally and unilaterally, without discussion or agreement with Wells

---

[14] Deposition of Steve Gilbert, Dkt. No. 68, Exh. A at 226-57.
[15] *See* Email dated Aug. 20, 2015 from Toni Cornforth at Black Iron to Andrew Sutherland at First Union Rail, which reads in full: "Please be advised due to legal issue pertaining to storage and security of the rail cars sitting on the Black Iron, LLC property these car cannot be moved until these issues are resolved. This is a notification to cease and desist the plan to start interaction on the cars next week." Dkt. No. 68, Exh. L (errors in original).

Fargo Rail. "For an offer to be one that would create a valid and binding contract, its terms must be definite and unambiguous." *Id.* (quoting *DCM Inv. Corp. v. Pinecrest Inv. Co.*, 34 P.3d 785 (Utah 2001)). One of the terms of a storage agreement would be the payment rate, and yet Black Iron changed the rate without negotiation or notice to Wells Fargo Rail. The fluctuating rate terms also negate the existence of a contract. Wells Fargo Rail has submitted substantial facts showing that no contract was formed.

Black Iron's argument in opposition does not present evidence of offer and acceptance, or other contract elements. Instead, Black Iron argues that if Wells Fargo Rail did not want to pay storage fees, it should have removed its Equipment within a reasonable time period. Allegations of delay do not create a contract. While the measure of a reasonable time period is a factual question, Black Iron failed to support its argument with evidence that 540 railcars and 4 locomotives could be inspected, repaired and moved in the summer of 2015, or that Wells Fargo Rail unduly delayed. Based on the emails and declarations and other evidence submitted, it appears that the effort Wells Fargo Rail made to remove its Equipment began immediately upon being informed the Equipment needed to be removed, and continued steadily throughout the summer of 2015. The Court does not see any evidence of unreasonable delay in these efforts. The contemporaneous emails are cooperative, and do not demonstrate impatience with the progress. In June 2015, Wells Fargo Rail had scheduled repair vendors to arrive on the Property on August 24, 2015 and stated that Black Iron's representative was aware of this timeline.[16] Four days before the repair vendors were scheduled to arrive, Black Iron withdrew its permission for Wells Fargo Rail to enter the Property. The uncontroverted evidence points to the conclusion that Black Iron ended Wells Fargo Rail's permission to be on the Property without prior notice. Wells

---

[16] *See* Declaration of Andrew J. Sutherland, Dkt. No. 68, Exh. I.

Fargo Rail did not have a chance to comply with a deadline because it was apparently unaware there was a deadline. Black Iron's argument that Wells Fargo Rail should have removed its Equipment before Aug. 20, 2015 is thus unavailing.

In the absence of a bilateral contract, Black Iron argues that there is a unilateral contract. For evidence, it relies on an email dated Sept. 2, 2015 from attorney Robert Bowers, representing Wells Fargo Rail's predecessor, to Cyndi Gilbert, an attorney representing Black Iron. Black Iron quotes the email thus: "Recall that it was Black Iron/GDC that asked that the equipment be removed if [Wells Fargo Rail] wasn't willing to pay to store them in place." From this sentence, Black Iron asserts that Wells Fargo Rail acknowledged a storage agreement. However, the sentence is taken out of context. The pertinent section of the email is as follows:

> I'm sure you know about the "cease & desist" email [Wells Fargo Rail] received about its equipment extraction efforts. I understand that [Wells Fargo Rail] and UP [Union Pacific Railroad] had an on-site visit scheduled for last week that had to be cancelled due to Black Iron/Gilbert Development's "cease & desist." Given the relative timing, I suspect that halting [Wells Fargo Rail's] efforts to retrieve its equipment was in response to the claims that [Wells Fargo Rail] filed against Black Iron/Gilbert Development over the CML asset purchase. I don't see how delaying extraction of [Wells Fargo Rail's] equipment serves anyone's interests. Recall that it was Black Iron/GDC that asked that the equipment be removed if [Wells Fargo Rail] wasn't willing to pay to store them in place. You know that [Wells Fargo Rail] had been taking the steps necessary to retrieve its equipment. That was taking time given the condition that CML left the cars and locomotives in. . . . When we speak, please let me know if Black Iron/GDC will allow [Wells Fargo Rail], [Union Pacific] and their vendors on-site to complete the extraction process. . . .[17]

The full email makes it clear that Wells Fargo Rail did not want Black Iron to keep Wells Fargo Rail's Equipment. This is further supported by the Declaration of Robert C. Bowers, in which he states that he did not make any sort of storage agreement with Steve Gilbert or anyone

---

[17] Email dated Sept. 2, 2015 from Robert T. Bowers to Cyndi Gilbert, Dkt. No, 68, Exh. T, pp. 78-79.

else at Black Iron.[18] The Court finds that this email does not support Black Iron's assertion of a unilateral contract.

The Court further finds that there was no meeting of the minds, offer, or acceptance that would create a contract between the parties. Wells Fargo Rail has carried its burden to show that there is no genuine issue of material fact on this issue, and Black Iron has not submitted sufficient evidence that would raise a question of fact. Because there was no contract, there is no need to consider evidence about breach or damages. Summary judgment should be granted in favor of Wells Fargo Rail on this issue.

### B. Breach of Implied Contract

A breach of an implied contract is better analyzed as a legal action in restitution. "The elements of . . . a contract implied in law, are: (1) the defendant received a benefit; (2) an appreciation or knowledge by the defendant of the benefit; (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying for it." *Davies v. Olson*, 746 P.2d 264, 269 (Ct. App. Utah 1987). "Contracts implied in fact are established by conduct." *Outsource Receivables Mgmt., Inc. v. Bishop*, 344 P.3d 1167, 1171 (Ct. App. Utah 2015) (quoting *Knight v. Post*, 748 P.2d 1097, 1100 (Ct. App. Utah 1988)). Like an express contract, an implied contract requires a meeting of the minds. Such a contract will be enforced by the court only if the agreement was intended by the parties. *See Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1001 (Utah 1991).

Black Iron's argument regarding an implied contract fails for the same reason its argument about an oral contract fails – it has not presented evidence that demonstrates a meeting of the minds. Wells Fargo Rail stated that it did not want Black Iron to store the Equipment.

---

[18] *See* Declaration of Robert C. Bowers, Dkt. No. 68, Exh. T.

Wells Fargo Rail took steps, hired contractors and otherwise made arrangements to retrieve the Equipment. By both statements and conduct, Wells Fargo Rail has demonstrated that it did not want to store its Equipment on Black Iron's Property. Wells Fargo Rail has submitted evidence that Black Iron refused it access to the Property while Wells Fargo Rail was working with contractors to retrieve the Equipment. An involuntary situation does not create a benefit for the one protesting the arrangement. Summary judgment in favor of Wells Fargo Rail should be granted on this issue.

### C. Unjust Enrichment

The elements required to prevail on an unjust enrichment claim are similar to the elements of a contract implied in fact. In order to prevail on this theory, Black Iron would need to show that "(1) a benefit was conferred, (2) the conferee appreciated or had knowledge of the benefit, and (3) the conferee accepted or retained the benefit under circumstances making it inequitable to retain the benefit without making payment of its value." *Thorpe v. Washington City*, 243 P.3d 500, 507 (Ct. App. Utah 2010).

These elements all turn on the presence of a benefit to a party. Black Iron argues that Wells Fargo Rail has received a benefit from storing its Equipment on Black Iron's Property without paying storage fees. However, as discussed in section V.A., the uncontroverted evidence submitted demonstrates that Wells Fargo Rail wanted to extract its Equipment from the Property, not have it stored, and particularly not at the storage rates stated by Black Iron. Wells Fargo Rail did not receive a benefit from Black Iron's actions; instead, it was prevented from retrieving its Equipment. Summary judgment should be granted in favor of Wells Fargo Rail on this theory of recovery.

### D. Warehouse Lien

Black Iron asserts that it is entitled to a statutory warehouse lien over the Equipment. Under Utah law, a "warehouse" may have a lien against a bailor "on the goods covered by a warehouse receipt or storage agreement." Utah Code Ann. § 70A-7a-209(1).

### 1. Warehouse

The statute defines a "warehouse" as "a person engaged in the business of storing goods for hire." Utah Code Ann. § 70A-7a-102(m). Black Iron asserts that nothing in the statute requires that the person be solely engaged in the business of storing goods for hire. To support this assertion, Black Iron relies on *Enerco, Inc. v. SOS Staffing Services, Inc.*, 52 P.3d 1272 (Utah 2002). The court in *Enerco* considered whether a lease agreement conferred the status of warehouseman on the landlord. The tenant asserted that the landlord was liable as a warehouseman for the tenant's property losses. This is factually distinguishable from the present case, as there was no warehouse lien being asserted in *Enerco*. The court did allow for a broader definition of "warehouse" and stated that "the question of whether or not someone is a warehouseman depends upon whether he has accepted 'the responsibility of safekeeping the property of others entrusted to him.'" *Id*. at 1275 (quoting *Barlow Upholstery & Furniture Co. v. Emmel*, 533 P.2d 900, 901 (Utah 1975)). From this statement, Black Iron concludes that if a person expects to be paid to accept responsibility for storage and safekeeping of another's property, then that person is a warehouseman.

The Court is persuaded that with the right set of facts, an entity may be considered a warehouseman even if it is not primarily in the business of storing goods. However, Black Iron does not submit sufficient evidence that it accepted the responsibility for storage and safekeeping of the Equipment. Black Iron purchased the Property where the Equipment was located, and immediately asked Wells Fargo Rail to remove its Equipment. Wells Fargo Rail did not ask

13

Black Iron to accept responsibility for storage and safekeeping of the Equipment, but began

working to remove the Equipment. Black Iron then threatened to impose storage costs, and then

denied Wells Fargo Rail access to the Property. The language in the *Enerco* case presupposes a

party that wishes its chattel to be kept, i.e., the warehouseman accepts property entrusted to him

by the owner. In this situation, from the evidence presented, Wells Fargo Rail had no desire to

entrust its Equipment to Black Iron, and did not ask Black Iron to accept it. Black Iron retained

the Equipment on its Property despite Wells Fargo Rail's desire to remove it. This conduct does

not make Black Iron a warehouseman. *See, e.g., Mesa Development, Inc. v. Railroad Storage

and Drayage, Inc.*, 2011 WL 8184136 (Utah Dist. Ct. 2011) (finding that no warehouse lien

existed in the absence of a storage agreement, among other factors).

### 2. Storage receipt or storage agreement

While the Court does not believe Black Iron would be considered a warehouseman under

either the terms of the statute itself or by case law, the lack of a storage receipt or agreement

further diminishes Black Iron's assertion of a warehouse lien. The Utah statute that allows a lien

specifically references a "warehouse agreement or storage receipt." Utah Code Ann. § 70A-7a-

209(1). As discussed in sections V.A. and B addressing the contract argument, Wells Fargo Rail

did not agree to store its Equipment on Black Iron's property. There was no oral agreement for

storage, and Black Iron's refusal to allow Wells Fargo Rail access to the Property did not create a

storage agreement.

Black Iron asserts that it has a storage receipt, after a fashion. The evidence that Black

Iron submits is the quote from the Sept. 2, 2015 email from Robert Bowers to Cyndi Gilbert,

which was discussed in preceding section V.A. discussing the breach of contract claim. The

sentence Black Iron relies upon is taken out of context, and the preceding discussion is

applicable here. This email was reiterating Wells Fargo Rail's desire to remove the Equipment from Black Iron's property; it was not agreeing to a storage arrangement.

The Court finds that Wells Fargo Rail has carried its burden to demonstrate that there was no "warehouse receipt or storage agreement." Black Iron has not presented sufficient evidence that raises a genuine issue of material fact on this issue, as the Sept. 2, 2015 email does not support the proposition for which it is cited. Summary judgment should be granted in Wells Fargo Rail's favor on this issue.

**E. Trespass**

"A person is liable for trespass when, without permission, he intentionally enters land in the possession of another, or causes a thing or a third person to do so. . . . The phrase 'enters land' includes the presence upon the land of a thing which the actor has caused to be or to remain there." *Purkey v. Roberts*, 285 P.3d 1242, 1247 (Ct. App. Utah 2012) (international citations omitted). A trespass occurs "when a person intentionally 'enters land in the possession of [another], or causes a thing or a third person to do so.' . . . 'Enters land' is then defined as follows: . . . the phrase 'enters land' [includes] not only coming upon the land, but also remaining on it." *Carter v. Done*, 276 P.3d 1127, 1132-33 (Ct. App. Utah 2012) (quoting Restatement (Second) of Torts § 158(a) (1965)).

Black Iron has alleged that the continuing presence of the Equipment on its Property is a trespass committed by Wells Fargo Rail. CML Metals was using the Equipment in its mining operation prior to selling its assets to Black Iron. Mining operations ceased in November 2014 and CML Metals defaulted under the leases. Wells Fargo Rail submitted correspondence[19] and a

---

[19] *See* Letter dated Nov. 20, 2014 from CML Metals to Wells Fargo Rail, Dkt. No. 68, Exh. B.

supporting declaration[20] showing that CML Metals requested Wells Fargo Rail forbear on

exercising its options upon default while CML Metals sought to sell its assets. A forbearance

agreement was drafted, but never signed. This uncontroverted evidence established Wells Fargo

Rail's motivation for leaving the Equipment on the Property rather than retrieving it immediately

upon default, and establishes that Wells Fargo Rail had the prior owner's permission for its

Equipment to be on the Property. When Black Iron purchased CML Metals' assets, the

Equipment was still on the Property.

Wells Fargo Rail asserts that Black Iron does not own the railroad tracks, or at least not

all of them. Several hundred railcars may be on railroad tracks owned by Union Pacific, which

are on Black Iron's Property. Black Iron has not submitted evidence showing its ownership of

the railroad tracks, although the parties do not dispute that Black Iron purchased the underlying

land. This question of railroad track ownership muddies the issue of trespass, but does not appear

to be relevant to the issue of trespass.

It is undisputed that Wells Fargo Rail did not trespass initially, but had permission for its

Equipment to be on the Property. A trespass also occurs if permission to be on property is

withdrawn, and the trespasser or things remains.

> If the possessor consents to the presence on the land of a thing which is to be
> removed at some time thereafter, and if such consent is terminated or suspended,
> one entitled to the immediate possession of the thing is privileged, as against such
> possessor and his transferee, to be on the land at a reasonable time for the purpose
> of removing the thing in a reasonable manner and with reasonable promptness,
> unless he knows or has reason to know the time of such termination or suspension
> a reasonable period in advance.

Restatement (Second) of Torts § 177 (1965). Adopting this standard, Wells Fargo Rail had the

right to retrieve its Equipment within a reasonable manner and with reasonable promptness.

---

[20] *See* Declaration of Greg R. Johnson in Support of Motion for Prejudgment Writ of Replevin and Substitution of
Collateral, Dkt. No. 68, Exh. H.

16

Thus, the question of trespass turns on whether or not it was reasonable for Black Iron to assert

that the Equipment should have been removed on or before Aug. 20, 2015, and for Wells Fargo

Rail to have not yet removed the Equipment by that time.

To determine whether there is a genuine issue of material fact about the reasonableness of

Wells Fargo Rail's efforts and timing, the Court relies on the evidence provided. Wells Fargo

Rail submitted declarations, depositions and emails regarding the effort necessary to move the

Equipment. The Declaration of Andrew Sutherland, the Vice-President for Fleet Maintenance at

Wells Fargo Rail states:

> 5. From June 1-4, 2015, WFRC's inspection team inspected each of the 540
> railcars and four locomotives (the "Equipment") and determined that the
> Equipment needed to be tested, and needed significant repairs, before it could be
> extracted. WFRC does not have the internal capabilities to perform tests and
> repairs on, or to operate, its railroad equipment and instead hires third-party
> vendors for those services.
> 6. Extracting the Equipment from the Property was going to be a substantial
> project given the number of railcars, their state of disrepair, the need for a
> qualified repair vendor willing to mobilize long distance to a remote location, the
> configuration of the tracks on the Property, and the various areas at which the
> Equipment was located across the Property. Of the 540 railcars, approximately
> 350 were located on tracks miles away from Union Pacific Railroad's main line
> interchange.
> 7. **By June 18, 2015, I identified a repair vendor, Holland/M Bar D
> ("Holland"), that was willing to mobilize to the Property. I coordinated with
> Toni Cornforth of Black Iron/Gilbert Development Corporation to have
> Holland begin its work during the week of August 24, 2015**. Assuming we had
> Black Iron/Gilbert Development Corporation's cooperation, I anticipated that the
> necessary testing and repairs for 184 railcars at Union Pacific Railroad's main line
> interchange would be completed around December 2015. Arrangements to access
> the Equipment located away from Union Pacific's main line interchange were not
> determined with sufficient certainty to estimate a schedule for their removal.
> 8. WFRC also arranged for transportation and storage of its Equipment at
> Progress Rail Services' facility in Parsons, Kansas.
> 9. WFRC had multiple telephone conferences, including one on August 11, 2015,
> with Union Pacific regarding transportation and logistics for the extraction of the
> 184 railcars at Union Pacific's main line interchange as well as the remaining
> Equipment located elsewhere on the Property.[21]

---

[21] Declaration of Andrew J. Sutherland dated Oct. 15, 2018, Dkt. No, 68, Exh I (emphasis added).

17

Accordingly, Wells Fargo Rail had contracted with a repair vendor by June 18, 2015. It was

apparently the repair vendor's schedule that determined the Aug. 24, 2015 start date, and Toni

Cornforth at Black Iron was aware of this. There is no evidence that Black Iron communicated to

Wells Fargo Rail that this start date was unreasonable.

     In its briefing and at the hearing, Black Iron cited to the emails and efforts made by Wells

Fargo Rail during the summer of 2015 to inspect, repair and prepare its Equipment for removal.

Black Iron asserts that Wells Fargo Rail moved slowly and unduly delayed. However, any hints

of impatience are missing from the contemporaneous emails themselves. In an email dated June

18, 2015, Cyndi Gilbert, an attorney for Black Iron, stated that "We appreciate [Wells Fargo

Rail's] professionalism in inspecting the cars, etc. . . . in making this transition as painless as

possible."[22] An email string between Cyndi Gilbert at Black Iron and Robert Bowers of Wells

Fargo Rail with dates ranging from July 30, 2015 through August 5, 2015 was submitted to

support the assertion that Wells Fargo Rail was actively working on moving the Equipment, and

there is no indication in those emails that Black Iron wanted Wells Fargo Rail to move faster or

was getting impatient.[23] Also missing is any indication that Black Iron informed Wells Fargo

Rail that the deadline to get the Equipment moved was approaching.

     Wells Fargo Rail received the news that it needed to move its Equipment on or about

May 8, 2015. After a summer of working to do so, permission to be on Black Iron's Property

was revoked on Aug. 20, 2015. That was a span of 104 days, or about three and a half months.

Black Iron asserts that this was a reasonable time period to move the Equipment, but does not

---

[22] Email from Cyndi Gilbert to Robert Bowers dated June 18, 2018, Dkt. No. 68, Exh T, p.20.
[23] *See* emails between Cyndi Gilbert and Robert Bowers dated July 30, 2015 through Aug. 5, 2015, Dkt. No. 68, Exh. T, pp. 73-76.

support this assertion with facts. *See* Fed. R. Civ. Pro. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (stating that when a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial). Within six weeks of being informed that the Equipment needed to be moved, Wells Fargo Rail had hired a repair vendor. The repair vendor was to start work Aug. 24, 2015. Black Iron has not shown facts that would demonstrate that it was an unreasonable delay to hire a repair vendor who needed about eight weeks to mobilize a repair team to central Utah. After most of those eight weeks had elapsed, Black Iron withdrew permission for the repair vendor to enter its Property on only four days notice.

The contemporaneous communications and Steve Gilbert's deposition support the conclusion that the withdrawal of permission to enter the Property was not based on the lapse of a reasonable period of time to extract the Equipment, but was instead done in retaliation for the filing of a lawsuit against Black Iron. In support of this, Wells Fargo Rail has submitted a transcript of telephone calls in which Steve Gilbert described his decision to tell Wells Fargo Rail it could no longer come on Black Iron's property to remove the railcars by stating that "I'm going to hold the cars hostage"[24] and "I shut the railroad cars. They were moving them; I stopped it. I said, no, no, no. If we're going to be in a fight, we're going to fight, but the cars has got a lien on them for storage. And they didn't think that was very funny. . . . I'm fixing to raise some serious hell."[25] In his deposition taken March 30, 2018, Steve Gilbert stated that the "cease & desist" email on Aug. 20, 2015 was "triggered" by the filing of the lawsuit.[26]

---

[24] Transcript of a telephone call held Aug. 20, 2015 between Steve Gilbert and Brian Rothschild, Dkt. No. 68, Exh. C, pp. 7-15.
[25] Transcript of a telephone call held Aug. 21, 2015 between Steve Gilbert and Brian Rothschild, Dkt. No. 68, Exh. C., pp. 1-6.
[26] Steve Gilbert Deposition, Dkt. No. 68, Exh. A, 272:23 – 273:3.

Black Iron has not asserted facts that would support a finding that the decision to withdraw permission to remove the Equipment was based on the reasonable amount of time necessary to accomplish the project. Instead, the evidence points to the conclusion that Wells Fargo Rail was working with Black Iron's cooperation to remove the Equipment and had hired a repair vendor which could start work on Aug. 24, 2015. The evidence also supports the conclusion that Black Iron did not inform Wells Fargo Rail that the deadline would be Aug. 20, 2015, but that it caught Wells Fargo Rail by surprise when Black Iron withdrew permission to come on the Property. Black Iron has not submitted sufficient facts that would support a different conclusion.

The evidence shows, and is sufficient for the Court to find, that the Aug. 20, 2015 deadline to remove the Equipment from the Property was determined by the filing of a lawsuit, and not by the passage of a "reasonable" period of time to extract the Equipment. The evidence further shows, and is additionally sufficient for the Court to find, that Wells Fargo Rail was taking reasonable steps to extract its Equipment. Black Iron's claim for trespass fails because it did not adequately support its assertions with specific facts. Summary judgment may be granted to Wells Fargo Rail under Fed. R. Civ. Pro. 56(e)(3).

## VI. Conclusion

The factual record in this case is lengthy and complex but fairly clear. Wells Fargo Rail has properly supported its motion for summary judgment. Black Iron has stated that several elements of this case require factual findings, but it did not assert sufficient facts that would raise a genuine dispute about any material facts or that could support factual findings in its favor or defeat the motion of Wells Fargo Rail.

The claims that Black Iron asserts against Wells Fargo Rail under theories of breach of contract, contract implied in fact, unjust enrichment or a warehouse lien are premised on the assumption that Wells Fargo Rail wanted to leave its Equipment on Black Iron's Property. However, the evidence submitted shows that Wells Fargo Rail did not want to leave its Equipment on the Property. Wells Fargo Rail spent considerable effort and money to coordinate the retrieval effort, hire the personnel, perform inspections and repair, and otherwise work towards removing its Equipment. Black Iron did not raise a genuine issue of material fact that would support its assertion that Wells Fargo Rail agreed with Black Iron for storage services.

While the claim of trespass requires a determination of reasonableness, the record is clear enough that the Court is able to and does determine that Wells Fargo Rail's efforts were reasonable; Black Iron's deadline to remove the Equipment was influenced more by the filing of a lawsuit than by a judicious consideration of how much time would reasonably be necessary to remove the Equipment.

Therefore, Wells Fargo Rail's motion for summary judgment should be GRANTED.

The Court will enter the order.

## SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION ON DEFENDANTS/THIRD-PARTY PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON BLACK IRON, LLC'S CLAIMS AND MEMORANDUM IN SUPPORT (DKT. NO. 67)** shall be served to the parties and in the manner designated below.

By CM/ECF Notification:

- Troy J. Aramburu    taramburu@swlaw.com, nharward@swlaw.com,docket_slc@swlaw.com,sballif@swlaw.com
- Bret R Evans    brevans@swlaw.com, nharward@swlaw.com;docket_slc@swlaw.com;sballif@swlaw.com
- Dana T. Farmer    dfarmer@djplaw.com, eirvin@djplaw.com
- Blake Hamilton        bhamilton@djplaw.com
- Douglas Farr    dfarr@swlaw.com, docket_slc@swlaw.com;bandrews@swlaw.com
- Ralph R. Mabey    rmabey@kmclaw.com
- Adelaide Maudsley    amaudsley@kmclaw.com, tslaughter@kmclaw.com
- Amy F. Sorenson    asorenson@swlaw.com, smoen@swlaw.com
- Brian M. Rothschild   BRothschild@parsonsbehle.com, ecf@parsonsbehle.com

**By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

None